**Barry E. MUKAMAL, as Liquidating Trustee and Director and Officer Trustee of Far & Wide Corp., et al., Plaintiff,**

v.

**Phil BAKES, Andrew C. McKey, Craig Toll, George Gremse, Wellspring Capital Management LLC, Loan Capital Funding LLC, Carl M. Stanton, Greg S. Feldman, David C. Mariano, Jason B. Fortin, and Ernst & Young, LLP., Defendants.**

**No. 07–20793–CIV.**

United States District Court,
S.D. Florida.

Nov. 5, 2007.

Alexander Rundlet, Esq., and Robert C. Josefsberg, Esq., Miami, FL, for Barry Mukamal.

Damien J. Marshall, Esq., Ft. Lauderdale, FL, for Phil Bakes and all other defendants except Ernst & Young.

David A. Coulson, Esq., Miami, FL, for Ernst & Young, LLP.

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

ALAN S. GOLD, District Judge.

THIS CAUSE is before the Court on two motions: Defendant Ernst & Young's Motion to Dismiss and to Compel Arbitration [DE 3], and the remaining Defendants' Motion to Dismiss [DE 4]. Since Ernst & Young's Motion to Compel Arbitration was filed, the Plaintiff has stipulated that Count XI of the Complaint should be subject to arbitration as it relates to the claim of breach of duty of care to the Debtors. The Plaintiff also has withdrawn Count XI as it relates to the Debtors' creditors. All other counts of the Complaint remain pending and subject the to various motions to dismiss.

The case arises from an adversary bankruptcy proceeding involving the Far & Wide enterprise ("Far and Wide"), a conglomeration of travel companies consisting of Far & Wide Corporation, Far & Wide Travel Corporation, Adventure Center, Inc., African Travel, Inc., Far & Wide International, Inc., and Travel Media Services Corporation (collectively, the "Debtors"). The Plaintiff, Barry Mukamal, has filed the Complaint against the directors and officers of Far & Wide [1], Wellspring Capital Management, LLC, Loan Capital Funding, LLC, and Ernst & Young, LLP, in connection with events that took place before Far & Wide declared bankruptcy.

In his Complaint, the Plaintiff brings eleven claims for relief and alleges the following: (1) the named directors and officers of Far & Wide (collectively, the "Individual Defendants") breached their fiduciary duties to the Debtors; (2) the Individual Defendants breached their fiduciary duties to the Debtors' creditors; (3) the Individual Defendants aided and abetted the breach of fiduciary duties to the Debtors; (4) the Individual Defendants aided and abetted the breach of fiduciary duties to the Debtors' creditors; (5) Wellspring Capital Management, LLC and Loan Capital Funding, LLC (the "Wellspring Defendants") aided and abetted the breach of fiduciary duties to Debtors; (6) the Wellspring Defendants aided and abetted the breach of fiduciary duties to Debtors' creditors; (7) the Individual Defendants' claims against the bankruptcy estate of Far & Wide should be equitably subordinated; (8) the Wellspring Defendants misstates their purported debt claims against the bankruptcy estate; (9) the Wellspring Defendants' claims against the bankruptcy estate should be equitably subordinated;

---

1. The directors and officers of Far & Away who are named in this Complaint are Phil Bakes, Andrew C. McKey, Craig Toll, George Gremse, Carl M. Stanton, Greg S. Feldman, David C. Mariano, and Jason B. Fortin (collectively, the "Individual Defendants").

(10) Ernst & Young aided and abetted the breach of fiduciary duties to Debtors' creditors; and (11) Ernst & Young committed professional malpractice and breached its duty of care to Debtors and creditors.

Defendants have moved to dismiss all eleven counts of the Complaint. Defendant Ernst & Young moves to dismiss Count X and Count XI and to compel arbitration on Count XI. The remaining Individual Defendants' Motion seek to dismiss Counts I though IX.[2] Oral argument on the motions was held on Friday, September 7, 2007. At the Court's request, the parties filed supplemental briefing on the affect of recent Delaware Supreme Court decisions [**DE 33, 35, 39**]. After reviewing the arguments raised, I conclude that the Defendants motions should be granted in part and denied in part, as set forth below.

## I. *STANDARD OF REVIEW*

On a motion to dismiss, the court accepts a complaint's well-pleaded allegations as true. *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1150 (11th Cir.2001). The court construes the pleadings broadly and views the allegations in the complaint in the light most favorable to the plaintiff. *Watts v. Fla. Int'l Univ., et al.*, 495 F.3d 1289, 1295 (11th Cir.2007).

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "more than mere labels and conclusions." *Bell Atlantic Corp. v. Twombly*, —— U.S. ——, ——–——, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Indeed, "a formulaic recitation of the elements of a cause of action will not do." *Watts*, 495 F.3d at 1295 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

Although the court does not analyze the probability of actual proof of the complaint's allegations on a motion to dismiss, a plaintiff must allege " 'enough factual matter (taken as true) to suggest' the required element." *Watts*, 495 F.3d at 1295. Under the law of this Circuit, the pleading must create "plausible grounds to infer." *Id.* Thus, a claim will survive a motion to dismiss if it identifies "facts that are suggestive enough to render [the element] plausible." *Id.* at 1296 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

## II. *ALLEGATIONS IN PLAINTIFF'S COMPLAINT*

The relevant facts as alleged in the Complaint are outlined below, and I accept those facts as true for the purpose of considering Defendants' motions to dismiss.

Plaintiff Barry Mukamal brings these claims against Defendants in his capacities as both Liquidating Trustee of the Liquidating Trust and Directors and Officers Trustee (D & O Trustee) of the Directors and Officers Trust of the Debtors and certain of the Debtor's creditors. (Compl. ¶ 1.) Plaintiff was appointed as both Liquidating Trustee and D & O Trustee pursuant to the Third Amended Joint Liquidating Plan of Reorganization of the Debtors ("Plan") that was confirmed on December 19, 2005 in the underlying bankruptcy case, *In re Far & Wide Corp.*, Case No. 03–40415. (Compl. ¶ 1.) The Plan contains within it a D & O Trust Agreement which was also confirmed with the Plan. (Compl. ¶ 4.) Because the Bankruptcy Court consolidated all of the Debtors in its Order on December 19, 2005 ("Confirmation Or-

---

**2.** The "Wellspring Motion" was brought on behalf of all Defendants, with the exception of Ernst & Young.

der"), the Debtors are treated as a single, combined entity. (Compl. ¶ 8.)

Plaintiff alleges that his dual trusteeship empowers him to bring claims against the former directors and officers of Debtors on behalf of both (1) Debtors and (2) certain creditors who voted to approve the Plan and assigned their claims to the D & O Trust. (Compl. ¶ 4.) As the D & O Trustee, Plaintiff is authorized by the Plan to investigate, prosecute, and litigate the Debtor's D & O claims and the creditor's D & O claims. (Compl. ¶ 104.) Pursuant to the Plan, Plaintiff is also a representative of the beneficiaries of the D & O Trust, with the authorization to bring claims to monetize both the Debtor D & O Claims and the creditor D & O claims. (Compl. ¶ 105.) As the Liquidating Trustee, Plaintiff is further authorized to bring all other causes of action of the Debtors that were vested in the Liquidating Trust.[3] (Compl. ¶ 106.) Pursuant to the Plan, both the Liquidating Trust Agreement and the D & O Trust Agreement are governed by Florida law. DE 3, Ex. C (part 2 of 2) p. 19, 30.

The Individual Defendants were officers of one or more of the Debtors and/or served on their boards of directors and boards of directors' executive committees. (Compl. ¶¶ 10, 19, 27, 36, 57, 66, 75, 84.) As such, the Individual Defendants controlled and participated in the policies, operations and business of the Debtors. (Compl. ¶¶ 11, 20, 28, 37, 58, 67, 76, 85). Four of the Individual Defendants—Stanton, Feldman, Mariano, and Fortin—were also partners in the Wellspring Defendants. (Compl. ¶¶ 56, 65, 74, 83, 111).

Defendant Wellspring Capital Management, LLC ("Wellspring") manages private investment partnerships, including Loan Capital Funding, LLC ("LCF"), which focus on investing in or acquiring companies. (Compl. ¶ 45.) LCF functioned as a conduit between Wellspring and the Debtors. (Compl. ¶ 48.) Wellspring is a Delaware LLC with its principal place of business in New York. (Compl. ¶ 44.) All Defendants committed acts and caused injuries, described in more detail below, which took place within the state of Florida and gave rise to the claims in this case. (Compl. ¶¶ 13–14, 21–22, 30–31, 39–40, 52–53, 59–60, 68–69, 77–78, 86–87, 93–94.)

In 1999, The Wellspring Defendants and the Individual Defendants (collectively, the "Management Defendants") formed the Debtors by consolidating various providers of travel-related products and services. (Compl. ¶ 108.) As part of this process, the Wellspring Defendants invested $45 million in the Debtors and acquired a majority of the Debtors' stock between 1999

---

**3.** For the basis of these authorizations to bring claims, Plaintiff cites to the Liquidating Trust Agreement and the D & O Trust Agreement, both of which were incorporated into the Plan, and the Confirmation Order (Compl. ¶ 4.) Although Plaintiff does not attach the Plan, the Confirmation Order, the Liquidating Trust Agreement, or the D & O Trust Agreement to the Complaint, the Complaint refers to and relies upon these documents, and their authenticity is not disputed by the parties. I will therefore take judicial notice of the above documents. *See Adamson v. Poorter*, 2007 WL 2900576, *3 (11th Cir. October 4, 2007) ("[T]he foundation for defendant's ability to introduce 'central' documents at the motion to dismiss stage 'is that when a plaintiff files a complaint based on a document but fails to attach that document to the complaint, the defendant may so attach the document, and therefore the document, as one that could have or rather in fairness should have been attached to the complaint, is considered part of the pleadings and thus may be reviewed at the pleading stage without converting the motion into one for summary judgment.'") I decline to take judicial notice of all other documents that the parties have submitted with their motions to dismiss.

and 2000. (Compl. ¶ 110.) The Wellspring Defendants required the Debtors to appoint four Wellspring partners—Stanton, Feldman, Mariano, and Fortinas members of the six-member board of directors of Far & Wide. (Compl. ¶ 111.) With this majority on the board, the Wellspring Defendants controlled the board of directors of Far & Wide. (Compl. ¶ 51.)

Around June 30, 1999, the Debtors entered into a loan agreement with a group of banks which infused $70 million into the Debtors, collateralized by all of the assets of the Debtors. (Compl. ¶ 113.) In 2000, the Debtors obtained an additional $20 million in unsecured financing. (Compl. ¶ 115.)

The Debtors' revenues—derived primarily from sales of travel or travel-related services—were typically realized at least 60 days before a customer's departure because Debtors required payment in advance of travel. (Compl. ¶¶ 118–120.) In contrast, the Debtor's costs associated with providing travel-related services to customers typically accrued 45–60 days after a customer traveled. (Compl. ¶ 121.) Management Defendants used customer deposits to pay operating expenses and other costs accumulated by customers who had already traveled, instead of maintaining those deposits in a reserve account. (Compl. ¶ 124.)

In 2001, the Management Defendants represented to the banks who had previously lent Debtors $70 million (the "Bank Group") that a single purchaser could be found to purchase the rolled-up enterprise. (Compl. ¶ 141.) Management Defendants caused the Debtors to enter into agreements in which the Bank Group agreed to forebear from enforcing the Debtors' repayment obligations and waive their previous requirement that Debtors hold a percentage of customer deposits in restricted accounts. (Compl. ¶ 140.) As a result, the Bank Group required Debtors to engage consulting services, first KPMG (which resigned) and then The Recovery Group, in order to assist the Management Defendants in the operation of the Debtors' businesses. (Compl. ¶¶ 143–146.) The Management Defendants refused to heed the consultants' advice. (Compl. ¶¶ 147–149).

Essentially, the Management Defendants allegedly used false and misleading indicators of the Debtors' fiscal health to prop up the business, in an attempt to sell the rolled-up enterprise at a price high enough to give Wellspring Defendants a return on their initial investment. (Compl. ¶ 155.) Management Defendants relied on the roll-up strategy to (1) create the false impression of a significant amount of equity, (2) create the illusion of fiscal health by misrepresenting the financial condition of the Debtors, and (3) grossly overstate the value of the goodwill of the travel companies that were part of the roll-up enterprise. (Compl. ¶ 156.)

Defendant Ernst & Young ("E & Y") is a Delaware limited liability corporation that prepared audited financial statements for the Debtors for the years 1999 through 2002. (Compl. ¶¶ 91–92.) E & Y produced a consolidated financial statement for the Debtors for fiscal years 1999–2001 (the "2002 Statement") and years 2001–2002 (the "2003 Statement"), and each statement contained a going concern opinion. (Compl. ¶¶ 132–133.) Neither the statements nor the going concern opinions restated the value of Debtors' goodwill in light of sociopolitical events affecting the travel industry at that time. (Compl. ¶ 133.) Neither statement complied with the Numbers 121 or 142 of the Statements of Financial Account Standards ("SFAS"), and as a result, the Statements grossly overstated and misrepresented the value of Debtors. (Compl. ¶¶ 134–135.)

E & Y's Statements substantially assisted the Management Defendants' gross misrepresentation of Debtors' financial condition. (Compl. ¶ 158.) Foreseeable creditors relied on E & Y's Statements and continued to extend credit and provide deposits, advance payments, goods and services to the Debtors on open account. (Compl. ¶¶ 136,159.) Plaintiff alleges that E & Y's actions, taken together with the Debtors' $30 to $50 million negative cash capital basis, create a strong inference that E & Y knew or should have known that its financial statements grossly misstated the value of Debtors during the applicable years. (Compl. ¶ 137–138.)

Plaintiff alleges that it should have been clear to the Management Defendants as of October 2002 that the combined liabilities of Debtors exceeded the value of the Debtors' assets, (Compl. ¶ 160,) and that the Debtors were insolvent or operating in the zone of insolvency. (Compl. ¶ 163.) In October 2002, Management Defendants caused Debtors in borrow an additional $20 million from Ableco Finance LLC ("Ableco") and the Wellspring Defendants, incurring more than $1 million in fees on the Ableco loan. (Compl. ¶ 164.) Management Defendants were able to procure this debt based on E & Y's 2002 Statement. (Compl. ¶ 167.) In securing the Ableco loan, the Management Defendants converted a portion of Wellspring Defendants' equity position into a debt claim that would have higher priority in the event of Debtors' bankruptcy. (Compl. ¶ 170.)

Management Defendants chose not to file for bankruptcy or wind down the Debtors because it would have caused the Management Defendants to lose their $45 million investment in Debtors, and Wellspring would have been at the bottom of the priority scheme for repayment. (Compl. ¶ 169.) On June 21, 2003, the Management Defendants purchased additional directors and officers' liability insurance for themselves. (Compl. ¶ 174.) When the Ableco loan came due on July 15, 2003, the Management Defendants extended the payment date on the loan for six months and agreed to increased interest rates and fees. (Compl. ¶¶ 175–177.) The Management Defendants' decisions to secure the Ableco loan and to extend its maturity date were made to further the interests of the Wellspring Defendants, at the expense of Debtors and their creditors. (Compl. ¶¶ 172–173, 178–180.)

Around July 15, 2003 and thereafter, Management Defendants continued to pursue deposits from customers who would be traveling later in the year, even though Management Defendants knew or should have known that there was a substantial likelihood that these customers would not be able to take those trips. (Compl. ¶¶ 181–182.) Management Defendants misrepresented to these customers that the Debtors would provide them with travel services that they had purchased. (Compl. ¶ 183.)

In addition, in or about July 2003, Management Defendants began paying vendors 90 days after providing travel services to their customers. (Compl. ¶¶ 185–186.) On September 10, 2003, the Wellspring Defendants advanced another $400,000 to Debtors, and this money was added to Wellspring Defendants' senior secured claim which had a priority over existing creditors. (Compl. ¶¶ 188–189.)

On September 23, 2003, the Management Defendants placed the Debtors into bankruptcy and immediately shut down operations. (Compl. ¶ 190.) Customers who had pre-paid for travel filed claims against Debtors in excess of $25 million. (Compl. ¶ 193). Debtors sold most of their divisions for a total of $14 million, even though they were previously purchased for $150 million. (Compl. ¶ 194.) As of the entry of the Confirmation Order on De-

cember 19, 2005, the Debtors' former employees held priority claims totalling $636,000; the Debtors' customers held priority claims totalling more than $5.6 million; and creditors, vendors, employees, customers, and lenders held general unsecured claims totalling more than $146 million. (Compl. ¶¶ 196–198.)

Plaintiff, on behalf of the bankruptcy estate, now brings these claims against Defendants for breach of fiduciary duty, aiding and abetting the alleged breaches of fiduciary duty, and professional malpractice.

## III. JURISDICTION

Because this action is an adversary proceeding related to the bankruptcy case of the Debtors, I have jurisdiction over this case pursuant to 28 U.S.C. § 1334.

## IV. STANDING AS TO COUNTS X AND XI AGAINST ERNST & YOUNG AND COUNTS II, IV, AND VI AGAINST THE INDIVIDUAL AND WELLSPRING DEFENDANTS

### A. General Allegations

The Plaintiff has sued Ernst & Young in two counts of the Complaint. Count X alleges aiding and abetting breach of fiduciary duty to the Debtor's Creditors. Count XI alleges "professional malpractice" against Ernst & Young to the Debtors "and to any third parties who relied upon their negligently prepared audited financial statements." (Compl. ¶ 274.) Plaintiff sued the Individual Defendants in Counts II and IV for, respectively, breach-

ing their fiduciary duties to Debtors' creditors and aiding and abetting the beach of fiduciary duties to creditors. In addition, Plaintiff also sued Wellspring Defendants in Count VI for aiding and abetting the breach of fiduciary duties to creditors.

With regard to standing to bring these counts, Plaintiff alleges that, pursuant to the Plan, which was confirmed on December 19, 2005, he received three authorizations to pursue breach of fiduciary duty and related claims against the Individual and Wellspring Defendants on behalf of the Company and on behalf of the Company's unsecured creditors[4] who unconditionally assigned their claims to Plaintiff as the Plan's Director and Officer Trustee (the "D & O Trustee") and Liquidating Trustee. (Compl. ¶¶ 1, 2–4, 101–07.) Plaintiff, therefore, is not a bankruptcy trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code. Rather, he alleges that he is a representative appointed pursuant to 11 U.S.C. § 1123(b)(3) to enforce the claims unconditionally assigned to him by unsecured creditors who voted to approve the Plan and was also appointed to enforce claims on behalf of the bankruptcy estate that vested in him upon confirmation of the Plan, He claims that he is charged under the Plan with prosecuting the assigned unsecured creditors claims and any other cause of action so as to monetize these claims for distribution pursuant to the Plan.[5]

### B. Preliminary Considerations

A party who is neither the debtor nor the trustee but who seeks to en-

---

4. The Plaintiff alleges that the "unsecured creditors" consist of the thousands of employees who worked for the Company but did not receive their final paychecks, customers who paid deposits to the Company but never traveled (or received only partial travel), and businesses who provided services to the Company but were never paid. (Compl. ¶¶ 194–98.)

5. The Plan at 21, § 10.12, provides: "[u]pon entry of the Confirmation Order, the D & O Trustee is authorized to investigate, prosecute and, if necessary, litigate the Debtors D & O Claims and the Creditor D & O Claims on behalf of the Debtor D & O Beneficiaries and shall have standing as a representative of the D & O Beneficiaries to pursue any and all appropriate causes of action necessary to

force a claim must establish (1) that it has been appointed, and (2) that it is a representative of the estate. *Pardo v. Pacificare of Tex., Inc. (In re APF Co.)*, 264 B.R. 344, 353 (Bankr.D.Del.2001) (citing *Retail Mktg. Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052, 1054 (10th Cir.1993); *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327–28 (10th Cir.1989)). The first element requires the court approve the appointed party, as for example, through plan confirmation. *APF Co.*, 264 B.R. at 353. The second element generally requires a court to decide "whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly the debtor's unsecured creditors." *Id.* Here, there is no argument concerning Plaintiff's appointment. Rather, the standing issue concerns the second element.

### C. *Defendants' Standing Arguments*

In Count XI, Plaintiff filed a "professional malpractice" claim against Ernst & Young on behalf of the Debtors. Plaintiff now concedes that the professional malpractice claim asserted on behalf of Far & Wide Corporation must be arbitrated [DE 24 at page 7]. In addition, Plaintiff has abandoned any claim for professional malpractice asserted in Count XI against Ernst & Young on behalf of certain unsecured creditors (i.e."... any third parties who relied upon their negligently prepared audited financial statements....") (Compl. ¶ 274.)

The remaining count against Ernst & Young is Count X("Aiding and abetting breach of fiduciary duty to the Debtors' Creditors") which Plaintiff brings on behalf of unsecured creditors in his capacity as Director & Officer ("D & O") Trustee. (Compl. ¶¶ 264–270); DE 24 at pages 3, 8.

As to this Count, Ernst & Young argues that the Plaintiff lacks standing to assert claims against it on behalf of the unsecured creditors because: (1) the Creditors never assigned their direct claims against Ernst & Young under the Bankruptcy Plan, or otherwise authorized Plaintiff to pursue such claims, and (2) any purported assignment by Creditors of their claims against Ernst & Young is invalid as a matter of law. Closely aligned, the Individual Defendants, based on *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), argue that Counts II, IV and VI should be dismissed because Plaintiff lacks standing to assert these claims on behalf of the unsecured creditors.

Because standing is jurisdictional under Article III, it is a threshold issue; if the putative plaintiffs lack standing, they may not be entitled to have their claims litigated in federal court. *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1330 (11th Cir.2007). Furthermore, "the plaintiff has the burden to clearly set forth facts sufficient to satisfy Article III standing requirements." *Eubank v. Leslie*, 210 Fed. Appx. 837, 843 (11th Cir.2006) (quoting *Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1230 (11th Cir.2000)); *Elend v. Basham*, 471 F.3d 1199, 1206 (11th Cir.2006) ("If the plaintiff fails to meet its burden [on standing], this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury.") (internal quotations omitted).

#### 1. *Whether the Creditors Assigned their Claims against Ernst & Young Under the Plan*

■ Ernst & Young argues that Plaintiff's standing to bring his aiding and

---

monetize the Debtors D & O Clams and the Creditor D & O Clams." The Plan defines the Creditor D & O Claims to mean any claims

Creditors may have against the Debtors or their current or former directors and officers as well as the proceeds of such claims.

abetting breach of fiduciary duty claim against it is not provided for in the Plan and Confirmation Order. The allegations of the Complaint provide, in part, that "pursuant to the Plan, all creditors who affirmatively voted to approve the Plan knowingly, specifically, individually, and intentionally assigned their claims against the Defendants in the D & O Trust to be brought by Plaintiff as D & O Trustee" (Compl. ¶ 103); that, "pursuant to the Plan, Plaintiff, as D & O Trustee, was authorized to investigate, prosecute and, if necessary, litigate the Debtors' D & O Claims and the Creditor's D & O Claims" (Compl. ¶ 104); and, "pursuant to the Plan, Plaintiff was also authorized to have standing as a representative of the beneficiaries of the D & O Trust to pursue any and all appropriate causes of action necessary to monetize the Debtor's D & O claims and the Creditor D & O claims" (Compl. ¶ 105), and "pursuant to the Plan, all other causes of action of the Debtors were vested in the Liquidating Trust to be prosecuted by Plaintiff as Liquidating Trustee" (Compl. ¶ 106).

It is fundamental that, on a motion to dismiss, I must accept all well-pled allegations of a complaint as true, but as noted in *Horsley v. Feldt,* "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed [the authenticity is not in dispute]." *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir.2002); *See Adamson v. Poorter,* 2007 WL 2900576, *3 (11th Cir. Oct.4, 2007). In this case, the Plan is referenced in the Complaint. None of the parties question that the Plan is central to Plaintiff's claim, and all agree that the Plan, as attached to the Motions to Dismiss, is "authentic." Accordingly, I am not limited only to considering the allegations of the Complaint, but may examine the plain language of the Plan.

Having considered both the allegations, and the plain and undisputed language of the Plan, I concur with Ernst & Young's argument that the assignment is limited **only** to those claims that the Creditors may have against the **Debtors or their current or former directors, and officers.** In establishing the "Duties and Powers of the D & O Trustee," the Plan provided that the D & O Trustee is specifically "authorized to investigate, prosecute and, if necessary, litigate ... the Creditor D & O Claims [on behalf of the unsecured creditors] *and shall have standing as a representative of the D & O Beneficiaries to pursue **any and all** appropriate causes of action necessary to monetize the ... **Creditor D & O Claims.**"* DE 4, Ex. G (Plan) at 21, § 10.12 (emphasis added). The key phrase is the "Creditor D & O Claims." In the definition section, the "Creditor D & O Claims" means "any claims Creditors may have against **Debtors** or their current or former directors and officers as well as the proceeds of such Claims." DE 24 at page 3 n. 2 (quoting Plan, Exhibit B, at 1). At oral argument, the Plaintiff agrees that this definition applies, but argues that the claim for aiding and abetting against Ernst & Young is "necessarily" the type of cause of action the Plan is talking about to "monetize" the "Creditor D & O Claims." The word "monetize," however, must be read in conjunction with phrase "Creditor D & O Claims." Thus, the "causes of action" that the Plaintiff can bring to "monetize" such claims are whatever causes of action he has against the Directors and Officers. While the unsecured creditors may have assigned to the D & O Trust (and to Plaintiff as the "D & O Trustee") their claims against the Debtor and its directors and officers, the relevant portions of the governing documents do not support the Plaintiff's position that there was such an assignment of third party claims. *See Trenwick Am. Litig. Trust v. Ernst & Young, LLP.,* 906 A.2d

168, 189 (Del.Ch.2006)("... although the definition of 'Causes of Action' contemplates the possibility of assignment of creditors' claims to the Litigation Trust, no automatic assignment of such claims arises from this definition or elsewhere in the plan of reorganization"), *affirmed, Trenwick Am. Litig. Trust v. Billett,* 931 A.2d 438 (Del.2007). Because such third party claims were not directly assigned, they are not property of the bankruptcy estate, and, thus, Plaintiff lacks standing to pursue them.[6]

2. *Whether Plaintiff otherwise has standing to pursue the claims of the Debtors' Creditors to proceed against Ernst & Young (under Counts X), the Individual Defendants (under Count II and IV), and the Wellspring Defendants (under Count VI)*

 Counts II, IV, VI, and X of the Complaint set forth causes of action that are based upon the purported assignment of claims belonging to Far & Wide's individual creditors. Ernst & Young and the other Defendants[7] correctly argue that a trustee (or litigation trust) does not have standing to purse the direct claims of creditors, but is only empowered to pursue the claims belonging to the debtor. *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)(holding that a reorganization trustee had no standing to assert claims of misconduct against a third party on behalf of the debtor's creditors).[8] Without doubt, *Caplin* and its progeny apply here.[9] The issue, however, is whether the *Caplin* rule applies if there is an "unconditional assignment of creditor claims." Even as to this issue, there is authority that the rule stated in *Caplin* holds true even in cases where a creditor has assigned all claims to a trustee or trust. *See In re Bennett Funding Group, Inc.,* 336 F.3d 94 (2d

6. At oral argument, I inquired if the Plaintiff desired to pursue an amendment to the Plan. The Plaintiff stated that he may wish to do so.

7. Ernst & Young and the remaining defendants also argue lack of standing under Delaware law under the recent decision of the Delaware Supreme Court in *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92 (Del.2007). Before addressing this aspect of the standing issue, I first must determine whether Delaware law applies. This issue is addressed below.

8. The Supreme Court affirmed for three reasons. First, the Court concluded that there was no provision in the bankruptcy laws allowing a trustee to assume the responsibility of suing on behalf of creditors of the estate. The Court held that a trustee is not authorized to "collect money not owed to the estate." *Caplin,* 406 U.S. at 428, 92 S.Ct. 1678. Second, the Court reasoned that the debenture holders, rather than the trustee, should be allowed to decide whether to sue Marine. These holders, the Court stated, "are capable of deciding for themselves whether or not it is worthwhile to seek to recoup whatever losses

they may have suffered by an action against" Marine. *Id.* at 431, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195. Third, the Court concluded that because the debenture holders would not be bound by the judgment in the trustee's action against Marine, they would be able to sue Marine directly in a separate suit, thereby increasing the amount and complexity of litigation relating to the losses suffered by the debenture holders. *Id.* at 432, 92 S.Ct. 1678. For these reasons, the Court held that the trustee lacked standing to sue Marine. *Id.* at 432–34, 92 S.Ct. 1678.

9. In its supplemental memorandum [**D.E. 35**], Plaintiff argues for the first time that Florida law, not Federal bankruptcy law, applies. The Plaintiff's new contention is based on the argument that the D & O Trust "was not created by the Bankruptcy Code." Plaintiff's new argument is patently wrong. It both contradicts his prior admission ("Plaintiff is a representative appointed pursuant to 11 U.S.C. § 1123(b)(3)"), but also the clear wording of Section 1123(b)(3), which allows for the prosecution of litigation claims "by the debtor, by the trustee, *or by a representative of*

Cir.2003)(explaining that the assignment of creditors' claims did not confer standing on the trustee); *Williams v. California 1st Bank*, 859 F.2d 664, 666 (9th Cir.1988)("Although we are mindful that, unlike *Caplin*, the creditors here assigned their claims to the Trustee, we do not think the mere fact of assignment in order to allow the Trustee to pursue the claims for the creditors sufficiently distinguishes this case to allow of a different result. Evaluating the Trustee's claim in light of the three concerns that informed the Court's holding in *Caplin* reveals substantially the same problems exist"); *In re Gaudette*, 241 B.R. 491, 499–502 (Bankr.D.N.H.1999); *Trenwick*, 906 A.2d at 191 (dicta).

The assignment issue has not been directly addressed in the Eleventh Circuit. The only Eleventh Circuit case cited by the Defendants is *E.F. Hutton & Co. v. Hadley*, 901 F.2d 979 (11th Cir.1990) which held, on its facts, that a bankruptcy trustee lacked standing to bring an action on behalf of a portion of the customer creditors. The Plaintiff argues that the *Hutton* case,[10] which applied *Caplin*, is purportedly distinguishable here, based on the allegations of the Complaint, because in *Hutton*, (1) the GIC customer creditors never delegated to the trustee the authority to pursue their claims, (2) all three *Caplin* factors were found to be present;[11] and (3) the claims were only asserted by a limited subgroup of creditors. The problem with the Plaintiff's analysis, however, is that the Complaint itself only alleges that it is brought on behalf of "certain of the Debtors' creditors pursuant to the Third Amended Joint Liquidating Plan of Reorganization...." DE 1, page 1, ¶ 102 at page 15. The Plan itself provides for two sources of distribution. The first is for Debtor claims which will be pursued by

*the estate appointed for such* purpose." (emphasis added). Under applicable law, a representative appointed under Section 1123(b)(3) "possesses the same standing as that of a [bankruptcy trustee] during the existence of the estate." *In re Railworks Corp.*, 325 B.R. 709, 719 (Bankr.D.Md.2005). I conclude there is no distinction between a bankruptcy trustee and a litigation trustee for purposes of this case. Under either situation, bankruptcy law governs the question of ability to purse any assigned claims, consistent with the analysis in *Caplin* and its progeny.

**10.** The Eleventh Circuit stated: "We recognize that there has been divergence among the circuits concerning the ability of a bankruptcy trustee to bring actions against third parties on behalf of creditors of the bankrupt. *See, e.g., St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir.1989); *Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988); *Steyr–Daimler–Puch of Am. Corp. v. Pappas*, 852 F.2d 132 (4th Cir.1988); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir.1987), cert. denied, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222 (8th Cir.), cert. denied,

484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *In re MortgageAmerica Corp.*, 714 F.2d 1266 (5th Cir.1983). On the facts of this case, however, we approve the reasoning of the Ninth Circuit in *Williams*, an analogous case factually and procedurally, and the Eighth Circuit in *Ozark Equip. Co.*, where those respective circuit courts determined that the bankruptcy trustee does not have standing to assert claims of creditors of the bankrupt. **We emphasize that our holding is restricted to the specific facts in this case.**" *Id.* at 985 (emphasis added).

**11.** In *Caplin*, the misconduct of a third party (the indenture trustee) injured the debtor's debenture holders. The bankruptcy trustee sought to assert a cause of action against the debenture trustee on behalf of the debenture holders. *Id.* at 418–20. The Court denied the trustee standing to sue based on three factors: (1) nothing in the Bankruptcy Act or other relevant law gave the trustee standing to sue third parties on behalf of the debenture holders; (2) the debtor had no claim against the indenture trustee; and (3) the trustee's suit and subsequent actions initiated by the debenture holders could lead to inconsistent results. *Id.* at 428–34, 92 S.Ct. 1678.

the Trustee and will go to all creditors. The second is for assigned Creditor claims which will benefit, upon any recovery, only those creditors who had assigned their claims by voting in favor of the Plan. As set forth in Section 8.2 of the Plan: "Any Creditor entitled to vote under the Amended Plan who holds a Creditor D & O Claim and who independently pursues its own claims against the Debtors ... may not vote to accept the Amended Plan unless such Creditor agrees in writing to transfer any recovery received in such litigation ... to the D & O Trust".[12]

The effect of this division between creditors who assigned, and those who did not assign, is to implicate the third concern in *Caplin* that it is "possible" that the Trustee's suit on behalf of the "assigned creditors" could be "inconsistent with any independent actions that they [non-assigning creditors] might bring themselves." *Caplin*, 406 U.S. at 431–32, 92 S.Ct. 1678.[13] The *Williams* Court commenting on this problem, stated:

> Finally, although those investors who assigned their claims are precluded from bringing individual suits, there remains the potential for inconsistent actions by those who did not assign. The failure of the Trustee to obtain assignments from

all the investors bears out the Caplin Court's fear that "it is extremely doubtful that the trustee and all [creditors] would agree on the amount of damages to seek, or even on the theory on which to sue." *Id.* at 432, 92 S.Ct. at 1687. Inconsistent actions increase the chance that the Trustee will find her interests diverging from those of the investors on whose behalf she is suing. *See id.* at 432 n. 21, 92 S.Ct. at 1687 n. 21. Furthermore, we are unsatisfied, as was the Court in Caplin, "that by giving [the trustee] standing to sue ... we would reduce litigation." *Id.* at 434, 92 S.Ct. at 1688.

We agree with the Eighth Circuit that Congress' express decision not to overrule *Caplin* is "extremely noteworthy." *Ozark Equip. Co.*, 816 F.2d at 1228. We also share that court's certitude that "Congress' message is clear—no trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee[,] has power under ... the Code to assert general causes of action, such as [an] alter ego claim, on behalf of the bankrupt estate's creditors." *Id.* (Emphasis added.)

The *Hutton* court applied and followed both the Eighth and Ninth Circuit opinions

---

**12.** At oral argument, counsel for the Plaintiff conceded that this description is a "fair statement."

**13.** In his supplemental opposition (at page 5), Plaintiff downplays the risk of "the potential for conflicting results between assigning and non-assigning creditors." I disagree, and conclude that there is a distinct risk of conflicting results within the sub-group of assigning creditors. To this effect, the Liquidating Plan expressly permits the assignor-creditors to initiate and pursue their own identical actions independent of litigation initiated by the Plaintiff, so long as their independent actions do not seek the proceeds of the directors and

officers insurance policies that cover the defendants. Section 8.2 of the Liquidating Plan states, in relevant part, "Nothing herein, however, shall prevent any Creditor with a Creditor D & O Claim from asserting independent claims against current and former directors and officers of the Debtors to the extent that such claims do not attempt to recover proceeds of any D & O Policies that may provide separate and distinct entity coverage for covered wrongful acts of the Debtors in the absence of relief from the automatic stay imposed by 11 USC § 362(a) upon proper notice to all interested parties." Liquidating Plan, § 8.2 at page 15.

in *Ozark* and *Williams*. Based on the facts of this case, I conclude that the Eleventh Circuit would continue to follow those Circuits' opinions here and conclude that *Caplin* applies because of the failure of the Trustee to obtain assignments from all of the creditors. Accordingly, I conclude that the Plaintiff lacks standing on this ground as well and that Counts II, IV, VI and X should be dismissed.

I do not reach the issue of whether the Eleventh Circuit would follow the Fourth Circuit's reasoning in *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 512 (4th Cir.2005)(concluding that a *per se* ban on trustee suits based on assignments from creditors finds no support in *Caplin*) because *Logan* is distinguishable on its facts. Unlike the circumstances alleged here, *Bogdan* involved a full assignment of creditor claims. *Bogdan* went on to say that the unconditional assignments acquired by Bogdan's trustee differed substantially from the assignments the trustee acquired in *Williams*. The creditors in *Bogdan*, unlike in *Caplin*, had relinquished and assigned their claims to the trustee, and, accordingly, there was no danger of inconsistent results or conflicting litigation. I leave for another day the question of whether an absolute assignment of "all creditor claims" avoids the *Caplin* prohibitions, assuming the Plaintiff is able to amend the Plan.

## V. WHETHER COUNT X OF THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST ERNST & YOUNG, AND FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE INDIVIDUAL AND WELLSPRING DEFENDANTS

Ernst and Young argues that, under controlling Delaware law, the creditors have no breach of fiduciary duty claim against the officers and directors of Far & Wide, and thus, there can be no claim that Ernst & Young aided and abetted any such breach; and (2) the Complaint does not adequately plead Ernst & Young's knowledge of or substantial participation in the underlying scheme allegedly perpetrated by Far & Wide's officers and directors.[14] Because I dismiss for lack of standing, I need not reach these issues.

In addition, the Individual Defendants argue that, as to the Debtor's fiduciary claims (Counts I, III and V), the are "exculpated pursuant to Delaware law, and the remainder are not actionable because they allege behavior consistent with the Individual Defendants' exercise of fiduciary duties, and (2) the purportedly assigned fiduciary duty claims of the Debtor's Creditors (Counts II, IV, and VI) do not exist under Delaware law.[15] Because these arguments involve common issues of law, I will address them together at this time."

14. Ernst & Young also argue that the Creditors' claim for professional malpractice is barred under Florida's two-year statute of limitation. For reasons stated, I also do not reach this issue.

15. The Individual and Wellspring Defendants have stipulated to withdraw their arguments, at the motion to dismiss stage, that Plaintiff's breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims are barred by any applicable statute of limitations. DE 23, page 8.

The first common issue is whether Florida or Delaware law governs under the applicable choice of law analysis.

### A. Does Florida or Delaware Law Govern?

■ The Complaint states that this Court "has jurisdiction over this action pursuant to 28 U.S.C. § 1334 because the claims contained relate to the bankruptcy case" of Far & Wide (Compl. ¶ 97.). When proceedings "pursuant to the grant of jurisdiction under 28 U.S.C. § 1334 covering civil actions related to bankruptcy proceedings, federal courts 'employ the forum state's choice of law doctrines where the underlying rights and obligations are defined by state law.'" *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2002 WL 362794, *5 (S.D.N.Y. Mar.6, 2002)("A federal court sitting in diversity jurisdiction applies the choice of law doctrines of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941))." *In re Chanel Fin., Inc.*, 102 B.R. 549, 550 (N.D.Tex.1988) (applying choice of law principles of forum state in adversary proceeding related to bankruptcy). Both parties concede that this statement of law is accurate and agree that Florida's choice of law rules apply. The parties differ, however, on the application of those rules.

■ Under Florida law, courts must characterize the claims at issue—whether they are torts, contracts, etc.—and then look to the Second Restatement of Law on Conflict of Laws. *Grupo Televisa v. Telemundo Commc'ns Group, Inc.*, 485 F.3d 1233, 1240–1241 (11th Cir.2007);[16] *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n. 19 (11th Cir.1989); *In re Deer Creek Prod., Inc.*, 325 B.R. 913, 916 (S.D.Fla.2005). Once it has characterized the legal issue, the court next determines the choice of law rule that the forum state applies to that particular type of issue. *Telemundo*, 485 F.3d at 1240. As noted in *Telemundo*, Florida, as the forum state here, "resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." *Id.* As further explained by the Eleventh Circuit, "The Restatement (Second) of Conflict of Laws provide a 'General [Tort] Principle' in section 145 that is intended to inform courts as they apply the more specific 'Choice of Law Principles' outlined in section 6. The more specific 'Choice of Law Principles' apply to all areas of law which determine choice of law through a most significant relationship test, not just to issues of tort." *Id.*

More specifically, Florida courts have adopted the significant relationship test articulated in Section 145 of the Restatement:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrences and the parties under the principles of § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

**16.** *Telemundo* is the Eleventh Circuit's most recent statement of Florida's choice-of-law rules. In *Telemundo*, § 145 applied because the case involved a "tort action." In analyzing choice-of-law principles, the Eleventh Circuit carefully evaluated the commentary, which it found the district court ignored, which provided that in cases involving misappropriation of trade values, the principal location of the defendant's conduct is the single most important contact. *Id.* at 1240. As noted below, this case involves § 309, not § 145(2), and a different commentary applies.

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflicts of Laws § 145.[17]

Section 6 of the Restatement, referred to in Section 145, provides the following policy considerations for choice-of-law questions:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of the other interested states and the relative interest of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflicts of Laws § 6; *see Digioia v. H. Koch & Sons,* 944 F.2d 809, 812 (11th Cir.1991).

■ For claims involving corporations and their officers and directors, both the Eleventh Circuit and Florida courts have further analyzed choice of law questions by looking to the sections of the Restatement that address those particular claims. *Int'l Ins. Co. v. Johns,* 874 F.2d 1447, 1458 n. 19 (11th Cir.1989) ("We, therefore, feel comfortable in applying Restatement (Second) of Conflicts of Laws § 309, which provides that the law of the state of incorporation governs the liabilities of the officers or directors to the corporation.");[18] *Chatlos*

---

**17.** Section 145 of the Restatement advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Grupo Televisa,* 485 F.3d at 1240 (quoting Restatement (Second) of Conflict of Laws).

**18.** In *International Insurance,* an insurer under a director's and officer's liability policy brought an action seeking declaratory judgment that it had no obligation with respect to a claim for payments expended in the settlement of a shareholder's derivative action which alleged corporate waste in creation of a golden parachute plan and consulting agreement. In considering the choice of law standard, the Eleventh Circuit stated:

Florida corporate law controls this issue for two reasons. First, because the parties failed to consider the choice of law in this diversity case, we must presume that the substantive law of the forum (Florida) controls. *Baltimore Orioles, Inc. v. Major*

League Players, Assn., 805 F.2d 663, 681 n. 33 (7th Cir.1986), cert. denied, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). Second, we believe the dictates of *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) require an application of Florida corporate law. Under *Klaxon Co.,* we must apply the choice of law rules of Florida to this diversity case. *Id.* Although the Florida Supreme Court has not addressed the choice of law in this corporate context, we believe that a Florida court would apply the choice of law rules of the Restatement (Second) of Conflicts of Laws (1971). Florida courts have utilized this treatise in other choice of law areas. *E.g., Bishop v. Fla. Specialty Paint Co.,* 389 So.2d 999 (Fla.1980) (applying §§ 145–146 of Restatement (Second) of Conflicts of Law); *Cont'l Mortgage Investors v. Sailboat Key, Inc.,* 395 So.2d 507 (1981) (applying § 203 of Restatement (Second) of Conflicts of Law). We, therefore, feel com-

*Found., Inc. v. D'Arata,* 882 So.2d 1021, 1023 (Fla. 5th DCA 2004). *review denied. D'Arata v. Chatlos Found., Inc.,* 894 So.2d 969 (Table) (applying sections 302 and 309 of the Restatement and holding that "[c]laims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation"); *Tinwood N.V. v. Sun Banks, Inc.,* 570 So.2d 955, 959 (Fla. 5th DCA 1990) (applying Section 309 of the Restatement (Second) of Conflict of Laws), *disagreement recognized on other grounds; Select Portfolio Servicing, Inc. v. Evaluation Solutions, L.L.C.,* 2006 WL 2691784 (M.D.Fla.2006)("Under the internal affairs doctrine [citing *Chatlos],* the law of the state of incorporation normally controls the affairs internal to the corporation").[19] Of significance, the Plaintiff fails to discuss or distinguish either *Chatlos* or *Johns.*

 I first address the choice of law rules which apply to the Plaintiff's breach of fiduciary duty claims against the Individual Defendants, who were directors and officers of the Debtors. The Plaintiff's claims sound in "corporate law," and fall squarely within that set of claims arising from the "internal affairs" doctrines; that is, the subset of claims of a corporation that related to its directors and officers.

As such, the most specific and applicable provision of the Restatement (Second) of Conflicts of law is § 308 dealing with "Director or Officer Liability."[20] According to the Restatement, the law of the state of incorporation is applied to determine the directors' or officers' liability to creditors and shareholders, unless there an applicable local statute on choice of law or unless "some other state has a more significant relationship to the occurrence and the parties." Restatement § 309(c); *see* Restatement § 302(2). Furthermore, for claims against officers and directors, "this law [of the state of incorporation] has usually been applied even in a situation where it might be thought that some other state had a greater interest that the state of incorporation in the issue to be determined. The local law rule of a state other than the state of incorporation is most likely to be applied in a situation where this rule embodies an important policy of the other state and where the corporation has little contact with the state of its incorporation." Restatement § 309(c).

Plaintiff argues that, under Florida's "significant relationship test," Florida law should apply because Florida has the most significant relationship to this action. Plaintiff claims that the Individual and

---

fortable in applying Restatement (Second) of Conflicts of Laws § 309, which provides that the law of the state of incorporation governs the liabilities of the officers or directors to the corporation. Cf. *Robert A. Wachsler, Inc. v. Florafax Intern., Inc.,* 778 F.2d 547, 549–550 (10th Cir.1985) (applying Restatement (Second) of Conflicts of Law to merits because forum state applied other sections of Treatise). Because Southwest incorporated in Florida, "Florida law controls." *Id.* at 1458 n. 19.

19. In *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), the United States Supreme Court likewise concluded: "As a general matter, the law of the

state of incorporation normally determines issues relating to the internal affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. *See* Restatement (Second) of Conflict of Laws § 302, Comments a & e, (1971). Cf. *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975)."

20. Commentary "a" to § 309, provides that the scope of the section applies when "[L]iability will typically be imposed upon directions under the rule of this Section for such matters as fraudulent or negligent mismanagement of the corporation's affairs...."

Wellspring Defendants caused tortious acts within the State of Florida; "caused injury to persons and property within the State of Florida, while engaged in solicitation or service activities within the State of Florida"; and "engaged in substantial and not isolated activity within the State of Florida...." (Compl. §§ 13–16, 21–24, 30–33, 39–42, 52–54, 59–62, 68–71, 77–80, 86–89.) In its brief, Plaintiff further claims that the Defendants' conduct; the injury suffered; the Company's domicile and principal place of business; and the place where the relationship between the parties is centered, including the pending bankruptcy, are in the State of Florida, rather than Delaware. DE 23, p. 6. However, the allegations of the Complaint do not set forth any specific facts to support the assertions in that are characterized in the Plaintiff's brief. To the contrary, the only "fact" established is one **not** pled in the Complaint—that Far & Wide (and related entities) are Delaware corporations.[21] Plaintiff has not pled that any of the Debt-

ors were incorporated in Florida. Based on the allegations in the Complaint, I cannot determine that Florida has a greater interest than Delaware in how these claims of breach of fiduciary duties are determined. Therefore, without more at this juncture, I will apply Delaware law to my analysis of the claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty against the Individual Defendants.[22]

My analysis is similar with respect to choice of law on Plaintiff's breach of fiduciary duty claims against the Wellspring Defendants. According to Section 306 of the Restatement, the law of the state of incorporation will determine the obligations owed by a majority shareholder, "except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 [of the Restatement] to the parties and the corporation, in which event the local law of the other state will be applied." Restatement

---

**21.** I take judicial notice of the state of incorporation of Far & Wide, as referenced in DE 4, Ex. F.

**22.** Similar to diversity, since I apply the law of the forum state, I must determine how the matter would be resolved by the Florida Supreme Court. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1271 (11th Cir. 2002) (stating that where the issue is a question of Florida law, "federal courts are required to construe such law as would the Florida Supreme Court. Absent some indication that the Florida Supreme Court would hold otherwise, federal courts are bound to adhere to decisions of its intermediate courts.") (internal citations and quotations omitted); *see also State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir.2004) ("In the absence of guidance from the Florida Supreme Court, we follow relevant decisions of Florida's intermediate appellate courts.")

I conclude that the Florida Supreme Court would likely apply the law set forth in *Chat-*

*los.* In *Chatlos*, the Fifth District relied on Florida statutory law in deciding to apply the law of the state of incorporation to a claim against a corporate director. The Court cited to Fla.Stat. § 617.1505(3), which is part of Florida's Not–For–Profit Corporation Act, which states: "This act does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to conduct its affairs in this state." The Florida Business Corporation Act contains a virtually identical provision as Fla.Stat. § 607.1505(3), which provides: "This act does not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state." Thus, the Defendants' argument that the Florida legislature has codified the internal affairs doctrine which prohibits courts from applying Florida law to the internal affairs of out-of-state corporations, such as Far & Wide, appears to be well-founded. I, however, do not need to reach this issue at this juncture since the matter has not been fully briefed, nor has the record been fully explicated on the contacts in question.

§ 306. Based on the Complaint's allegations, I cannot determine that Florida has a more significant relationship to the parties and to the Debtors. I will therefore apply Delaware law to my analysis of the claims for breach of fiduciary duty claims and aiding and abetting breach of fiduciary duty claims against the Wellspring Defendants.

B. *Does the Delaware Supreme Court's Recent Decision in North American Catholic Educational Programming Foundation, Inc. v. Gheewalla Require Dismissal of Counts II, IV and VI Against the Individual and Wellspring Defendants and Dismissal of Count X Against Ernst & Young for Lack of Standing?*

▇▇▇▇ I already have determined under Federal law that the Plaintiff lacks standing to bring the Debtor's Creditors' claims against Ernst & Young and the Individual Defendants. I further address the issue at this part of the Order under Delaware law. In *N. American Catholic Educational Programming Foundation, Inc. v. Gheewalla,* the Delaware Supreme Court held that creditors of an insolvent corporation operating in the zone of insolvency could not bring a direct breach of fiduciary duty action against the corporation's directors. *Gheewalla,* 930 A.2d at 100–101. Based on this holding, the Defendants argue that, because Counts II, IV, VI and X of the Complaint set forth causes of action based upon the purported assignment of claims belonging to Far & Wide's individual creditors, the counts should be dismissed in that, under *Gheewalla,* creditors of a Delaware corporation cannot bring **direct** claims for breaches of fiduciary duty against directors or officers under any cir-

cumstances, including insolvency.[23] The Defendants argue for dismissal because the alleged basis for the purported assignors' ability to bring direct fiduciary duty claims was Far & Wide's financial condition as of October 2002. (Compl. ¶ 208.) ("Because the Individual Defendants knew or should have known that as of October 2002 the Debtors were insolvent and/or operating in the zone of insolvency, they jointly and severally had a fiduciary relationship with and owed the Debtors' creditors fiduciary duties of due care and good faith"). Consistent with this argument, Ernst & Young also seeks dismissal because if no direct claim can be made against the officers and directors of Far & Wide, then "Plaintiff cannot state a claim against Ernst & Young for allegedly aiding and abetting those officers and directors in breaching their fiduciary duties to Far & Wide's creditors." DE 27, page 7.

While the Defendants' argument is correct as far as it goes, I must address the other significant part of the Delaware Supreme Court's decision which holds: "Creditors may nonetheless protect their interest by bringing **derivative** claims on behalf of the insolvent corporation or any *other* direct nonfiduciary claim . . . that may be available for individual creditors." *Id.* at 8. More specifically, the Court stated:

> It is well settled that directors owe fiduciary duties to the corporation. . . . When a corporation is insolvent, . . . its creditors take the place of shareholders as the residual beneficiaries of any increase in value. Consequently, the creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary

---

**23.** "In this opinion, we hold that the creditors of a Delaware corporation that is either insolvent or in the zone of insolvency has not right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors." *Id.* at ——.

duties. The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value.... Individual creditors of an insolvent corporation have the same incentive to pursue valid derivative claims on its behalf that shareholders have when the corporation is solvent. *Id.*

While *Gheewalla* did not involve a "post-bankruptcy" proceeding, such as in this case, the question remains whether its reasoning would apply to a situation where a trustee files claims pursuant to a plan, confirmed by a bankruptcy judge, which contemplated such a suit by a trustee to pursue creditor claims on behalf of the estate.[24] I conclude that, under the facts of this case, *Gheewalla's* "derivative exception" is inapplicable. First, Counts II, IV and VI are not true derivative actions. The Plaintiff is bringing claims under Counts II, IV and VI on behalf of the creditors that assigned the claims (and Count X against Ernst & Young), but the Plaintiff has no greater right to assert those claims than would the creditors themselves. This is in contrast to a true "derivative action" where the creditors themselves bring a claim on behalf of **all** creditors of the estate because the Trustee did not bring such a claim against the Debtor's directors and officers on behalf of the estate. Here, the Plaintiff has filed such claims under Counts I, III and V, from which, if recovery is obtained, the creditors would share *pro rata* among themselves, and not on behalf of all creditors. Second, the Plaintiff cannot avoid the "direct claims" limitation by virtue of the assignments because, under Delaware law, the subject assignments are insufficient to avoid the effect of *Caplin*. See *Trenwick*, 906 A.2d at 190.[25] Third, the events at issue, while brought post-bankruptcy, all occurred pre-bankruptcy, during insolvency, which still fall under the interests *Gheewalla* sought to protect. *Gheewalla*, 930 A.2d at 103. ("To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to the individual creditors)." Thus, even if Federal law did not apply, and Delaware

24. In his supplemental memorandum, Plaintiff argues that *Gheewalla* does not apply when a plaintiff alleges that the company is insolvent, as opposed to merely being in the zone of insolvency. The clear language of *Gheewalla* supports the opposite conclusion. The Delaware Supreme Court held that "... the creditors of a Delaware corporation *that is either insolvent or in the zone of insolvency* have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors." *Id.* at 94 (emphasis added). Plaintiff's attempt to rely on a pre-*Gheewalla* decision of the Delaware Chancery Court, in *Prod. Res. Group v. NCT Group, Inc.*, 863 A.2d 772 (Del.Ch.2004), is unavailing because the Delaware Supreme Court, in *Gheewalla*, expressly rejected the *dicta* in *Production Resources*. *Gheewalla*, 930 A.2d at 102 n. 43 and 103.

25. The Defendants cite to *Medlin v. Wells Fargo Bank (In re I.G. Servs.)*, 2007 WL 2229650 (Bankr.W.D.Tex. July 31, 2007) for authority that *Gheewalla* applies in a bankruptcy situation where the plan provided that individual investors could contribute their claims into an investor claim trust, and also appoint a trustee to pursue the actions held by the trust. The Bankruptcy judge concluded that the Investor Claims Trust could only stand as a derivative action and it cannot survive as a direct action. He further found that, as a derivative action, it was barred by res judicata because a derivative action on behalf of the corporation had already been prosecuted by the corporation itself in arbitration, and that the same action could not be prosecuted derivatively on behalf of the corporation.

law applied, I still would dismiss Counts II, IV, VI and X, for the reasons stated above.

C. *Has the Plaintiff [on behalf on the Debtors] Sufficiently Pleaded Breach of Fiduciary Duty Claims Under Delaware Law against the Individual Defendants under Counts I, Ill and V?*

In their Motion, the Individual and Wellspring Defendants raise two grounds as to why the Plaintiff/Debtors' fiduciary duty counts fail to state a claim: (1) Plaintiffs' fiduciary duty claims are time-barred under Delaware's three year statute of limitations for counts based on breaches of fiduciary duty, and (2) certain allegations are exculpated pursuant to Delaware law, and the remainder are not actionable because they allege behavior consistent with the Individual Defendants' exercise of fiduciary duties. DE 4, pages 8–18. In his response brief, Plaintiff states that the Defendants have agreed to withdraw, at the motion to dismiss stage, their arguments that Plaintiff's breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims are barred by any applicable statute of limitations. DE 23, page 8. As to the remaining argument, Plaintiff addresses it in two parts. First, Plaintiff concedes that corporate directors cannot be held personally liable for breaches of fiduciary duty to exercise "due care" under Delaware law.[26] Second, Plaintiff argues that he has pleaded sufficient allegations of breaches of the fiduciary duties of good faith and loyalty against the directors, and of breaches of duty of loyalty, good faith and due care against the officers.

I first address Plaintiff's concession.[27] Plaintiff agrees that " ... the provisions of

---

26. The Plaintiff had alleged that the Individual Defendants breached their fiduciary duty of good care to the Debtors by (a) refusing or failing to become adequately informed of all reasonably available information provided by the expert consultants that were referred to them by the Bank Group and other experts, and by (b) adopting a strategy of borrowing and stretching their trade payables while desperately waiting for a "white knight" suitor to purchase the entire failed and fatally flawed enterprise (Compl. ¶ 201.)

27. Plaintiff has agreed that breach of the duty of "due care," namely "gross negligence," by the Individual Defendant Directors would be exculpated by 8 Del.Code § 102(b)(7) because " ... grossly negligent conduct, without more, does not and cannot constitute a breach of fiduciary duty to act in good faith." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 65 (Del.2005). In *In re Walt Disney Co.*, the Delaware Court further stated:

The Delaware General Assembly has addressed the distinction between bad faith and a failure to exercise due care (i.e., gross negligence) in two separate contexts. The first is Section 102(b)(7) of the DGCL, which authorizes Delaware corporations, by a provision in the certificate of incorporation, to exculpate their directors from monetary damage liability for a breach of the duty of care. That exculpatory provision affords significant protection to directors of Delaware corporations. The statute carves out several exceptions, however, including most relevantly, "for acts or omissions not in good faith...." Thus, a corporation can exculpate its directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith. To adopt a definition of bad faith that would cause a violation of the duty of care automatically to become an act or omission "not in good faith," would eviscerate the protections accorded to directors by the General Assembly's adoption of Section 102(b)(7).
*Id.* at 65.
Second, the legislature has also recognized this intermediate category of fiduciary misconduct, which ranks between conduct involving subjective bad faith and gross negligence. Section 102(b)(7)(ii) of the DGCL expressly denies money damage exculpation for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." By its very terms that provision distinguishes between

8 Del.Code § 102(b)(7) would exculpate 'due care' violations by Defendants Feldman, Fortin, Mariano and Stanton because they were sued in their capacities as directors of the Company," but contend further that "the protections afforded by section 102(b)(7) for breaches of the fiduciary duty of due care do not, however, exculpate due care violations by *officers* [Defendant's Bakes, McKey, Gremse, and Toll] of the Company." In response, the Defendants argue that, under Delaware law, the protections apply with equal force to Far & Wide's officers as well as directors. This issue remains unsettled under Delaware law. No Delaware Supreme Court case has addressed the issue in the context of § 102(b)(7), and there appears to be a division of authority on whether Delaware's Business Judgment Rule [28] applies to corporate officers. *Stanziale v. Nachtomi*, 330 B.R. 56 (D.Del.2004)(business judgment rule applies to officers); *Grassmueck v. Barnett*, 2003 WL 22128263 (W.D.Wash. July 7, 2003)(same); *Potter v. Pohlad*, 560 N.W.2d 389 (Minn.Ct.App. 1997)(same); *Platt v. Richardson*, 1989 WL 159584 (M.D.Pa. June 6, 1989)(business judgment rule does not apply to officers). I do not need to reach this issue at this juncture because, on the face of the Articles of Incorporation, the protections under § 102(b)(7) are not invoked in favor of the corporate officers. Accordingly, the "due care" prong is still viable with respect to the Individual Defendants Bakes, McKey, Toll and Gremse in their capacity as officers.

Before addressing the sufficiency of the Complaint under the "due care" prong against the officers, I start by considering whether the Plaintiff has pleaded sufficiently against the Individual Defendants, in their capacity as directors, to fall under the exceptions to Section 102(b)(7). Section 102(b)(7) is not an absolute bar, but includes several exceptions. It "eliminat[es] or limit[s] the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, [except] ... (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit." 8 Del.Code § 102(b)(7). Thus, the question is whether the Complaint sufficiently pleads that the Individual Defendants, as directors, breached their duty of loyalty or acted in bad faith. The same inquiry applies to the Individual Defendants as officers.

Delaware law recognizes that not only do directors and officers "stand in a fiduciary relationship to their corporation and stockholders[,]" but "a majority shareholder, or a group of shareholders who combine to form a majority, has a fiduciary

---

"intentional misconduct" and a "knowing violation of law" (both examples of subjective bad faith) on the one hand, and "acts ... not in good faith," on the other. Because the statute exculpates directors only for conduct amounting to gross negligence, the statutory denial of exculpation for "acts ... not in good faith" must encompass the intermediate category of misconduct captured by the Chancellor's definition of bad faith.

*Id.* at 67

**28.** The "business judgment rule" is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. The presumption can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith.

duty to the corporation and to its minority shareholders if the majority shareholder dominates the board of directors and controls the corporation." *Matter of Reading Co.,* 711 F.2d 509, 517 (3d Cir.1983) (citations omitted); *see also In re MAXXAM, Inc.,* 659 A.2d 760, 771 (Del.Ch.1995) ("A shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation and its minority shareholders.")

Consistent with that view, Plaintiff alleges separate breaches of fiduciary duties of loyalty and good faith to the Debtors by the Individual Defendants. The Plaintiff claims that the Individual Defendants breached their duty of duty of loyalty to the Debtors by favoring the interests of the Wellspring Defendants at the expense of the interests of the Debtors and their respective shareholders (Compl. ¶ 202), and by exposing the Debtors to onerous trade debts and liability in order to savage the Wellspring Defendants' investment at all costs (Compl. ¶ 203). The Plaintiff further alleges that the Individual Defendants breached their duty of good faith to the Debtors by (a) failing to adopt a reasonable system of accounting and budgeting in the face of experts' insistence that such a system was not only necessary but critical; and (b) demonstrating a reckless indifference to the duties owed to the Debtors and their shareholders when, in pursuit of the interests of the Wellspring Defendants, they

(i) exposed the Debtors to unsustainable debt burdens and unnecessary surcharges, finance charges, accounting fees in the hopes of effectuating an eventual sale without implementing a back-up plan;

(ii) exposed the Debtors to increased liability by using new customers' deposits to pay down the Debtors' debts to ven-

dors, which resulted in thousands of customers being stranded; and

(iii) failed to plan for bankruptcy, except to increase and fund their own insurance coverage for acts of corporate malfeasance. (Compl. ¶¶ 202–205.)

As to these allegations, the Plaintiff further claims that "as a result of the aforementioned acts and omissions, which constitute breaches of their fiduciary duties to the Debtors, the Individual Defendants' direction, operation and management of the Debtors were fundamentally and grossly negligent and outside the purview of the business judgment rule under applicable state statutes." (Compl. ¶ 205.)

1. *Claim of Breaches of the Duty of Loyalty and Bad Faith by the Individual Defendant Directors and Officers*

Disloyalty, in the classic sense, is "preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation...." *In re the Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del.2006). As stated in *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939):

"Corporate officers and directors are not permitted to use their interest of trust and confidence to further their private interests ... A public policy, existing though the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and

lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest."

 In short, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1994). "The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." *Id.* Thus, the duty of loyalty "mandates that [a] director refrain from self-dealing." 1 R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations & Business Organizations § 4.35 (3d ed.2007). Under *Walt Disney Company Derivative Litigation*, such conduct would constitute the most egregious type, that is, "conduct motivated by subjective bad faith." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 67.

 But, the duty of loyalty "is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith [because] '[a] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.'" *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006) (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del.Ch. 2003)). According to the Delaware Supreme Court in *Stone*, "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not estab-lish an independent fiduciary duty that stands alone on the same footings as the duties of care and loyalty. Only the latter two duties where violated may directly result in liability, whereas a failure to act in good faith may do so, but indirectly." *Stone*, 911 A.2d at 371.

The type of "bad faith" that can violate the duty of loyalty, absent a classical self-interest, was addressed by the Delaware Supreme Court in *In re Walt Disney Company Derivative Litigation*. The Delaware Supreme Court recognized that the universe of fiduciary misconduct is not limited to either disloyalty in the classic sense (i.e., preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation) or gross negligence. Rather, there is another category (which does not involve [classical] disloyalty) but is qualitatively more culpable than gross negligence. As stated by the Court:

First, the universe of fiduciary misconduct is not limited to either disloyalty in the classic sense (i.e., preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation) or gross negligence. Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed. A vehicle is needed to address such violations doctrinally, and that doctrinal vehicle is the duty to act in good faith. The Chancellor implicitly so recognized in his Opinion, where he identified different examples of bad faith as follows:

The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

\* \* \*

For these reasons, we uphold the Court of Chancery's definition as a legally appropriate, although not the exclusive, definition of fiduciary bad faith. We need go no further. To engage in an effort to craft (in the Court's words) "a definitive and categorical definition of the universe of acts that would constitute bad faith" would be unwise and is unnecessary to dispose of the issues presented on this appeal.

*Id.* at 67, 68.

 Here, without stating it as such, the Complaint commingles allegations of both classical disloyalty and disloyalty in failing to act in the best interests of the Debtors by improperly continuing Far & Wide's operations. In this regard, the Complaint alleges that the Individual Defendants maintained Far & Wide's operations beyond October 2002 (instead of filing for bankruptcy protection at that time) in order to protect the Wellspring Defendants' equity investment-specifically, that

they (i) refused to cause Far & Wide to file for bankruptcy in October 2002 "because it would have caused the Wellspring Defendants to lose their $45 million investment" (Compl. ¶ 169); (ii) caused Far & Wide to secure additional loans in October 2002 "to further the interests of the Wellspring Defendants at the expense of the interests of the Debtors and their creditors" (Compl. ¶ 173); and (iii) in July 2003 "remained committed to avoiding a bankruptcy that would have compromised the Wellspring Defendants' equity" (Compl. ¶ 187).

 Notwithstanding these allegations, the focus of Counts I, III and V must be on the Debtors and their shareholders, not on the creditors who cannot bring direct actions for breach of fiduciary duty against corporate directors. In this regard, as noted in *Gheewalla,* "When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interest of the corporation for the benefit of its shareholder owners." *Gheewalla,* 930 A.2d at 101.

While I permitted Plaintiff to file a supplemental memorandum relating to the law on breach of fiduciary duty by directors and officers relative to the Debtors, the focus continues to be on claimed breaches of duties purportedly owed to individual *creditors* of Far & Wide, which, as I discussed above, fails to state a claim. *See,* e.g., Supp. Opp. at 11 (stating that "[I]ndividual and Wellspring Defendants breached their fiduciary duty of loyalty *to creditors* by favoring the interests of shareholder Wellspring *at creditors' expense.*") Very little, if any attention, is given to how or why any of the Individual and Wellspring Defendants breached any duties owed to Far & Wide, which is the

express premise of Counts I, III and V. In order to plead a claim for breach of fiduciary duty to Far & Wide, Plaintiff must allege the violation of duties owed to Far & Wide itself or to its minority shareholders.

■ Of significance, the Complaint is silent as to *who* constitutes the minority shareholders and *how* the majority shareholder's actions breached the duty of loyalty to them. In point of fact, the Complaint does not allege that the interests of the Wellspring Defendants were favored over those of other shareholders, or that Individual Defendants' decision-making failed to increase the value of Far & Wide's equity as to **all** shareholders. In terms of the Debtors themselves, it is not even alleged that the Debtors suffered any loss on the loan transactions in question, i.e. the borrowing of "an additional $20 million from Ableco Finance LLC ('Ableco') and the Wellspring Defendants in October 2002." (Compl. ¶ 164.) If the purpose of these loan transactions was to maximize shareholder wealth, absent some other aspect of bad faith, "Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. Even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm." *Trenwick,* 906 A.2d at 204. Thus, the mere act of incurring additional debt in the face of insolvency, alone, does not establish bad faith or disloyalty if the purpose was to maximize the value of the firm as to all shareholders.

As noted by the Chancery Court in *Trenwick* (and adopted by the Delaware Supreme Court):

Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at the time are creditors does not mean that the directors cannot choose to continue the firm's operation in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery. By doing so, the directors do not become a guarantor of success.

906 A.2d at 174.

Therefore, I conclude that these key omissions in the Complaint constitute pleading deficiencies which cannot cured by simple allegations, stated as conclusions. The alleged fiduciary breaches of disloyalty and bad faith against the Individual Defendant Directors in Counts I, III and V must be alleged with more particularity and not just be based on "breach of due care" allegations which support only allegations of gross negligence. Nor may these allegations be commingled with disloyalty and bad faith claims against the Debtors' creditors. For this reason, I dismiss without prejudice as against Defendants Stanton, Feldman, Mariano and Fortin as directors. I likewise dismiss without prejudice as against Defendants Bakes and McKey in their capacity as directors of one or more of the Debtors.[29] Moreover, I dismiss without prejudice as to Defendants Bakes, McKey, Toll and

29. The parties argue whether Section 102(b)(7) bars any due care claims against Defendants Bakes and McKey-each of whom served as an officer as well as a director. Because I am granting the motion to dismiss without prejudice, I will allow Plaintiff to amend to state any claimed breaches against Bakes and McKey in their separate capacities as officers and directors, consistent with the direction in this Order. I leave for another day the additional scope and reach of the Far & Wide certificate of incorporation relating to exculpation.

Gremse in their capacities as officers in terms of the "breach of the fiduciary duty of loyalty and good faith prong" because the Complaint fails to allege individualized allegations as to each of the Defendants from which an assessment can be made under the applicable criteria. Instead, the Complaint refers to them collectively in every instance and does not distinguish between their respective role as officers and as directors. The Complaint fails even to differentiate between actions taken by the directors collectively, versus the officers collectively, and fails even to identify what actions were taken by what distinct group (i.e. directors or officers). Dismissal is required for this reason as well. *In re Parmalat Sec. Litig.*, 501 F.Supp.2d 560, 565 n. 19 (S.D.N.Y.2007)(characterizing complaints as "disorganized" because they "lump defendants together, making it unclear which particular defendants are the subject of certain allegations and forcing the Court, where possible, to rely on context to understand plaintiffs' precise meaning.").

Having reached these conclusions, I am left with whether the Complaint adequately pleads as to the Defendants Bakes, McKey, Toll and Gremse, in their capacity as officers, for breach of the fiduciary duty of due care.

> 2. Claim of Breach of Duty of Due Care by Individual Defendant Officers

■■■■■ In discussing the fiduciary duty of due care required of directors of a Delaware corporation, the Delaware Supreme Court addressed the standard that is equally applicable to corporate officers. The fiduciary duty of due care requires that officers and directors of a Delaware corporation "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available" in making business decisions, and that deficiencies in the process are actionable only if the defendant's actions are "grossly negligent." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749; see also *Stanziale v. Nachtomi*, 330 B.R. 56, 2004 WL 878469 at *8 (D.Del. Apr.20, 2004)("Gross negligence also applies to the decision made by corporate officers."). *Stanziale* further provided that: "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.'" *Id.* (quoting *Tomczak v. Thiokol, Inc.*, 1990 WL 42607, at *12 (Del.Ch. Apr.5, 1990)). The gross negligence category includes the "failure to inform one's self of available material facts." *In re Disney Derivative Litig.*, 906 A.2d at 64.

■■■■ Applying this criteria, it would appear, at first glance, that the Complaint states sufficient allegations of gross negligence against the officers. The Complaint plainly alleges "reckless indifference" through mismanagement of Far & Wide by the Individual Defendants by "refus[ing] to heed the experts" advice on managing Far & Wide (Compl. ¶ 148); failing to "make realistic adjustments to booking and revenue projections" (Compl. ¶ 149(b)); failing to "streamline its redundant systems to contend with loss-producing world events" (Compl. ¶ 149(g)); "prepar[ing] unsubstantiated business plans based upon booking and revenue projections grounded exclusively on speculation and wishful thinking" (Compl. ¶ 153); refusing to become adequately informed of all reasonable information provided by the expert consultants (Compl. ¶ 201(a)); ignoring expert advise to cut redundant, duplicative and unnecessary costs (Compl.

¶ 201(a)(i)); ignoring the expert advice to formulate a back-up plan, or "Plan B" (Compl. ¶ 201(a)(ii)); borrowing and stretching their trade payables while desperately waiting for a "white knight" suitor (Compl. ¶ 201(b)); adopting a strategy that ignored the realities of the market (Compl. ¶ 201(c)), and refusing to exercise reasonable oversight of the Debtors' business (Compl. ¶ 201(d)). But, here again, the Complaint does not sufficiently allege which of the several officers was involved in "which" aspect of the alleged grossly negligent decision-making. Nor does the Complaint distinguish between the decisions made by Defendants Bakes and McKey in their capacity as officers as distinguished from their capacity as directors. Finally, the Complaint is silent as to which decisions were made by Defendants Toll, as Chief Financial Officer, and Gremse, as Chief Operating Officer,[30] and whether such decisions were made within their individual discretion or at the direction of the Board or other more senior corporate officers. The inadequacy of "lumping together" all of the Individual Defendants is discussed above and applies equally here. For this reason, the Defendants' motion to dismiss is granted without prejudice.

## VI. WHETHER COUNTS VII AND VIII OF THE COMPLAINT FAIL TO STATE A CLAIM FOR EQUITABLE SUBORDINATION AND RECHARACTERIZATION OF DEBT

In Count VII of the Complaint, Plaintiff represents that certain of the Individual Defendants have asserted debt claims against the Debtors based on purported loans to Debtors or unpaid salary, severance, bonuses, or other compensation.

(Compl. ¶ 240.) As such, Plaintiff requests that any unsecured claims of the Individual Defendants be equitably subordinated to the unsecured claims of all other creditors. (Compl. ¶ 242.)

■ Under 11 U.S.C. § 510(c), "after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." In this Circuit, a court may equitably subordinate a claim only when the following three elements are established:

(1) The claimant must have engaged in some type of inequitable conduct,

(2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant,

(3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Allied E. States Maint. Corp. v. Miller (In re Lemco Gypsum, Inc.)*, 911 F.2d 1553, 1556 (11th Cir.1990); *Estes v. N & D Props., Inc. (In re N & D Props.)*, 799 F.2d 726, 731 (11th Cir.1986) (stating that where the above three elements are established, "[b]inding precedent in this circuit holds that equitable subordination is proper").

■ Although I dismiss Plaintiff's separate claims for breach of fiduciary duty, conduct that may not rise to the level of a breach of fiduciary duty may still satisfy the element of "inequitable conduct" required to maintain a claim for equitable subordination. *See State of Fla., Dep't of*

---

**30.** Defendants Gremse and Toll are the only Individual Defendants who were officers and not directors.

*Ins., Div. of Rehab, and Liquidation v. Govaert (In re Miami Gen. Hosp., Inc.),* 111 B.R. 363, 366 (S.D.Fla.1990) ("In the case at bar the behavior of the Receiver in running the hospital, albeit not a breach of fiduciary duty, was clearly for its own benefits. The finding of the Bankruptcy court that the Receiver's claim should be subordinated as an insider claim cannot be disturbed by this Court on appeal as it is founded on solid legal ground.") Based on the allegations in the Complaint, I find that Plaintiff has sufficiently alleged enough facts to create plausible grounds to infer the three required elements for equitable subordination. *See Watts,* 495 F.3d at 1295. Therefore, the motion to dismiss is denied as to Count VII of the Complaint.

 Similarly, in Count VIII, Plaintiff requests that I recharacterize the Wellspring Defendants' debt claims, which are based on their purported pre-petition loans to Debtors, as equity claims. (Compl. ¶¶ 251–252.) Under the law of this Circuit, shareholder loans may be deemed to be capital contributions (or equity claims) when either "the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit." *N & D Props.,* 799 F.2d at 733. Throughout its Complaint, Plaintiff includes numerous allegations about Debtors' poor financial condition at the time of the Wellspring Defendants' loan. Again, I find that Plaintiff has sufficiently alleged enough facts to create "plausible grounds to infer" one of these required elements. *See Watts,* 495 F.3d at 1295.

Defendants argue that because Debtors received another loan around the same time as the loan from Wellspring Defendants, Plaintiff will not be able to show that no other disinterested lender would have extended credit. However, on a motion to dismiss, Plaintiff's Complaint only has to create "plausible grounds to infer." *Id.* Although the existence of this other loan may ultimately weigh in favor of Defendants' arguments on this claim, at this stage in the proceedings, I find that Plaintiff has sufficiently alleged the required element for its recharacterization claim. Therefore, the motion to dismiss is denied as to Count VIII of the Complaint.

Accordingly, it is hereby **ORDERED and ADJUDGED** that:

1. Defendant Ernst & Young's motion to compel arbitration as to Count XI is granted by stipulation. The remaining allegations of Counts XI of the Complaint against Ernst & Young are dismissed by agreement. Therefore, Count XI is dismissed in its entirety, and the Court reserves to enter any orders appropriate to the arbitration proceeding.

2. The Court grants Defendant Ernst & Young's motion to dismiss Count X without prejudice. Plaintiff shall file with the Court within thirty (30) days from the date below a notice if he intends to obtain an amendment of the applicable bankruptcy documents and orders to include Ernst & Young and all creditors. If no such intent to amend is filed, then the dismissal against Ernst & Young shall be with prejudice. The Court reserves to issue a final order of dismissal under those circumstances.

3. The Complaint as to Ernst & Young (Count X), and against the Individual Defendants in Counts II, IV and the Wellspring Defendants in Count VI is dismissed without prejudice under *Gheewalla.* The Plaintiff shall file with the Court within thirty (30) days from the date below a notice of intention to file a derivative action on behalf of all creditors. If no such notice is filed, the Count X against Ernst

& Young, and Counts II, IV and VI against the Individual Defendants shall be dismissed with prejudice. The Court reserves to issue a final order of dismissal under those circumstances.

4. Counts I, III and V of the Complaint are dismissed without prejudice, with the exception that these counts are dismissed with prejudice as against the Individual Corporate Defendant Directors Stanton, Feldman, Mariano, and Fortin only with respect to the "due care" allegations of the Complaint. As to the matters dismissed without prejudice, Plaintiff shall be permitted thirty (30) days from the date below to file an amended complaint. If an amended complaint is not filed, the Court reserves to dismiss Counts I, III and V with prejudice.

5. Defendants' motion to dismiss Counts VII and VIII is denied.

**DONE AND ORDERED.**